IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

COBY TOWNSEND HURST                                           PLAINTIFF

                    v.              Civil No. 5:20-cv-05158

CORPORAL LEVI FRANKS, Benton County
Detention Center; NURSE NADIA MALAPHA,
Turn Key Health Clinics LLC; SERGEANT
GREG HOBELMANN, Benton County Detention
Center; OFFICER RICHARD PAHMIYER, Rogers
Police Department; and DEPUTY JAMES SIKES,
Benton County Detention Center                                DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by Coby Townsend Hurst ("Hurst") pursuant to 42 U.S.C.

§ 1983.   Hurst proceeds *pro se* and *in forma pauperis* ("IFP").   Pursuant to the provisions of 28

U.S.C. §§ 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge,

referred this case to the undersigned for the purpose of making a Report and Recommendation.

The case is before the Court on the Motion for Summary Judgment (ECF No. 69) filed by

Officer Richard Pahmiyer; the Motion for Summary Judgment (ECF No. 73) filed by Corporal

Levi Franks, Sergeant Greg Hobelmann, and Deputy James Sikes; and the Motion for Summary

Judgment (ECF No. 79) filed by Nurse Nadia Malapha.   Hurst has responded to these Motions.

(ECF Nos. 87, 88, 91, 94).

## I.   APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences

in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any

1

material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."   *National Bank of Com. v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita*, 475 U.S. at 586.   "They must show there is sufficient evidence to support a jury verdict in their favor."   *Nat. Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)).   "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."   *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."   *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.   Officer Pahmiyer's[1]  Motion for Summary Judgment

### A.   Summary of the Facts

Hurst gave a deposition in this case, and testified that on Saturday, April 20, 2019, he was out walking, visited a Tyson's facility near his home and was told they had water problems.   (ECF No. 75-6 at 19).   Hurst says he was given something to drink "out of the machine."   *Id*.   He continued walking, entered an empty building across the street from a Jiffy convenience store and sat on a table.   *Id.* at 24.   When he got up from that table, Hurst says he "passed out and fell

---

[1] Officer Pahmiyer is sued only in his individual capacity.   The official capacity claims against him were dismissed on August 24, 2021 (ECF No. 59).

2

backwards and hit my head bad, worse than I ever hit it in my life." *Id.*   As a result of the fall, Hurst maintains he developed a bump on the back of his head and was bleeding from his head and ears.   *Id.* at 19.   Hurst saw the Jiffy manager as she was parking her car; told her he hit his head and had a head injury; and asked her to give him a ride home.   *Id.*   She refused saying she was late for work.   *Id.*   Hurst says he screamed in pain, wandered down the street (which was also downhill), and fell at the edge of the woods.   *Id.* at 19.   Hurst asked the owner of the adjacent home to call the ambulance for him.[2]   Hurst testified that the homeowner instead called the police. *Id.* at 19.

   Detective Yager was in the area of East Poplar Street and "elected to respond to assist until dispatched officers arrived on scene."   (ECF No. 69-8 at 1).   Detective Yager – who identified Hurst – was "very familiar with Hurst from multiple incidents regarding his erratic behavior."   *Id.*   The incidents "were consistently pertaining to Mr. Hurst's behavior being elevated because he believed someone was after him, trying to hurt him, trying to take something from him, or something else along those lines."   Detective Yager indicated he "also responded to multiple calls for service regarding fires being ignited at Hurst's residence."   *Id.*   During the incidents, Detective Yager says "Hurst regularly complained of excessive force being applied against him that allegedly caused injuries, even during incidents when force was not applied."   *Id.*

   When Hurst noticed Detective Yager approaching him, he "started to explain to me in a maniacal manner that Tyson's Foods was pumping poison[3] into the water at his house and that his

---

[2] The homeowner was originally named as a John Doe Defendant.   However, when Hurst failed to identify the John Doe by the deadline set forth in the Initial Scheduling Order (ECF NO. 54), the John Doe was terminated as a Defendant on October 18, 2021.
[3] In his response to Officer Pahmiyer's statement of facts, Hurst indicates Tyson was pumping Drano into the water system.   (ECF No. 88 at 4).

water was pure salt water."  (ECF No. 69-8 at 2).   To Detective Yager, Hurst "appeared to be under the influence of an intoxicant."  *Id.*   Hurst was asking to be taken to his house to get his blood pressure medicine.  *Id.*   When the other officers arrived, Detective Yager asked "Officer Pahmiyer to pull his vehicle up to the scene so Hurst's arrest would be captured on camera."  *Id.* Detective Yager had been advised by dispatch that Hurst "had warrants issued for his arrest out of the Bentonville Police Department and Farmington.[4]"  *Id.*   Once the vehicle was in place, Detective Yager "informed Hurst he had warrants for his arrest and that he was under arrest for public intoxication."  *Id.*   Detective Yager states he did not observe any injury to Hurst's head during his interactions with him.  *Id.* at 3.

According to Hurst, when Detective Yager arrived, Hurst was "l[]ying on my front side." (ECF No. 69-6 at 3).  He told the officer he had a head injury.  *Id.*   Hurst also testified he had a concussion.  *Id.*   A total of three officers were at the scene.  *Id.* at 4.    He testified he was unable to stand and the officers picked him up and tore something in his side.  *Id.* at 4   Although Hurst initially testified, he was not sure which officers picked him up because the video was not clear, Hurst then clarified that Officer Pahmiyer "put his knees into me and pulled on me when he cuffed me."  *Id.* at 4-6.   Hurst maintains something tore in his side when Officer Pahmiyer pulled on him.  *Id.*   Hurst was moved to the back of Officer Pahmiyer's patrol vehicle.  *Id.* at 4.   Hurst denies he was on any drugs.   (ECF No. 75-6 at 21).

Officer Pahmiyer's arrest report indicates he was dispatched at 9:05 a.m. to East Poplar Street due to a caller's complaint that Hurst was lying in the yard "acting crazy and yelling."  (ECF

---

[4] A failure to appear warrant was issued by the Bentonville District Court on April 12, 2019.   (ECF No. 75-2 at 8). A citation was issued and Hurst was given a court date of May 22, 2019.   *Id.* at 10.   A failure to appear citation was also issued directing Hurst to appear for court in Rogers on May 21, 2019.   *Id.* at 9.

No. 69-1 at 3).   The caller reported that Hurst was talking about salt in the water and wanting to talk to Doug Norwood.[5]   (ECF No. 69-7 at 1).

Officer Pahmiyer was the third officer to arrive at the scene.   (ECF No. 69-7 at 1).[6]   By affidavit, Officer Pahmiyer indicates that between his hiring date of November 21, 2016, and November 12, 2019, the Rogers Police Department had a total of 94 documented incidents involving Hurst.   (ECF No. 69-7 at 1).   Officer Pahmiyer was involved in 10 of those incidents. *Id.*   Officer Pahmiyer asserts that Hurst is known for abusing alcohol and narcotics and being uncooperative.   *Id.*   Officer Pahmiyer indicates he has "interacted with Hurst while he was intoxicated and while he was sober, and there is a clear difference in his demeanor.   On previous incidents, while Hurst was intoxicated, he seemed to have paranoid delusions regarding people being in his house, stealing his possessions, and trying to kill him."   *Id.*

When he arrived, Officer Pahmiyer observed Hurst lying in the grass on the east side of the driveway talking about his tap water being poisoned with salt.   (ECF No. 69-1 at 3).   Hurst indicated he could not stand up and walk because he had not taken his blood pressure medication. *Id.*   Officer Pahmiyer noted that Hurst's pupils were constricted; his movements were "very spastic;" and his statements "were paranoid and did not make sense."   *Id.*   Hurst also reported having a hole in the back of his head and stated his wrist was broken the last time he was incarcerated in the Benton County Detention Center ("BCDC").   *Id.*   According to Officer Pahmiyer, Hurst did complain that his head was hurting but when asked about it he just started talking about the poisoned water.   (ECF No. 69-7 at 2).   Officer Pahmiyer did not observe any injuries to Hurst's "head or wrists."   (ECF No. 69-1 at 3).

---

[5] A local attorney.
[6] The identity of the second officer on scene is not contained in the summary judgment record.

According to Officer Pahmiyer, Hurst was placed in handcuffs while he was on the ground, assisted to his feet, and then assisted to the patrol vehicle.   (ECF No. 69-1 at 3).   Officer Pahmiyer denies putting his knee into Hurst while assisting Hurst up and escorting him to the patrol vehicle with the help of Detective Yeager.   (ECF No. 69-7 at 4).   Hurst was told he was being taken to the BCDC and this upset him.   (ECF No. 69-6 at 2).   Hurst maintains he was not intoxicated.   *Id.* He states he had not taken his blood pressure medication "which raises my blood pressure, and people think I'm on meth when I don't have my pill."   *Id.*

While he was being handcuffed, Hurst complained about a "shoulder injury from falling in 2001."   (ECF No. 69-7 at 2).   When put in the patrol vehicle, Hurst "immediately scooted across the vehicle to the right side, putting his legs on the seat and leaned his head against the door. While being buckled in, Hurst complained of his head and shoulder hurting; however, he stated he could not sit up because he also had a hernia."   *Id.*

Hurst testified he was bleeding on the back of his head.   (ECF No. 69-5 at 2).   A few days later when he cleaned his ears out there was "blood on the Kleenex."   *Id.*

Officer Pahmiyer indicates that:

[d]ue to Hurst's demeanor and paranoid statements, it was determined he was under the influence of narcotics and was going to be charged with public intoxication. Because Hurst's primary reason for wanting to go to the hospital was believing he had been poisoned through his tap water, the other officers and I decided to take him to Benton County Jail to be held until he was sober without going to the hospital.

(ECF No. 69-7 at 2).   Hurst was arrested and charged with public intoxication.   (ECF No. 69-1 at 1);(ECF No. 75-2 at 13 (public intoxication ticket)).   Officer Pahmiyer' s arrest report indicates the time was 9:05 a.m.   *Id.*

Prior to Hurst being taken to the BCDC, he was taken to his home to get his blood pressure

6

medication.   (ECF No. 69-7 at 2).   Hurst's mother was at his house and Hurst attempted to talk to her and asked her to come to the patrol vehicle.   (ECF No. 75-6 at 22-23).   Hurst's mother came as close as four feet from the vehicle but came no closer.   *Id.* at 23.   In Hurst's opinion, this was because the officers told her he was on methamphetamine.   *Id.*   Hurst admits that his mother did not see any blood coming from his ears or his head.   *Id.*

Officer Pahmiyer states that "[w]hile being transported, Hurst continued to talk about his water being poisoned.   He also complain[ed] of his head hurting, shoulder hurting, wrist hurting, constipation, and his leg muscles not working."   (ECF No. 69-7 at 3).   Officer Pahmiyer indicates Hurst also stated that "he had a hole in his head from falling."   *Id.*   Officer Pahmiyer states he "never observed a head wound or any bumps, I did not observe bleeding from his ears."   *Id.* "Hurst continuously moved his legs around and leaned his head against the door while being transported."   *Id.*

When Hurst arrived at the BCDC, he was assisted out of the patrol vehicle and into the booking area.   (ECF No. 69-7 at 3).   Hurst "continued to yell at the jailers telling them to look at his head and stating that he needed his medicine."   *Id.*   According to Officer Pahmiyer, during booking a nurse was called to look at Hurst.   *Id.*   "Hurst was accepted by the jail with his blood pressure medication."   *Id.*   Hurst was then patted down and placed in a holding cell.   (ECF No. 69-5 at 3).   The intake form shows the time as 10:14 a.m.   (ECF No. 75-2 at 16).

Hurst denies that he was checked out before he accepted by the BCDC.   (ECF No. 88 at 6).   Instead, he says the officers just said he was on drugs and not injured.   *Id.*   On April 21, 2019, after he was released from the BCDC, Hurst arranged to be taken by ambulance to the Northwest Medical Center in Bentonville.   (ECF No. 69-3 at 1-2).   He complained of head pain

from his fall that occurred three days ago   *Id.* at 1.   It was noted that he was not in acute distress. *Id.* at 2.   On physical examination some "soft tissue swelling and ecchymosis[7] to the left parietal occipital" was noted.   *Id.*   A head CT was done.   *Id.* at 3.   No evidence was found "for intracranial hemorrhage, infarct, or mass effect."   *Id.*   Note was made "of bilateral soft tissue calcification within the cartilage of both ears and in the subcutaneous soft tissues posteriorly on the right side of the scalp."   *Id.*   Hurst was diagnosed with a closed head injury and told to follow up with his primary care provider within five to seven days.   *Id.* at 4 & 7.   The only note regarding the presence of any blood is a notation of dried blood in Hurst's left external auditory canal.   *Id.* at 6.   Hurst was discharged at 11:16 p.m.   *Id.* at 4.   According to Hurst, he was told his head was swollen and he should follow up with his doctor.   (ECF No. 75-6 at 44).   The only treatment Hurst received at the hospital was an over-the-counter pain reliever.   *Id.* at 44-45.   Hurst felt the hospital did not "really do much."   *Id.* at 45.

On February 14, 2020, Hurst pleaded guilty to the public intoxication charge.   (ECF No. 69-2 at 2).

### B.   Video Evidence

Defendants have submitted as exhibits eight USB video/audio files from the patrol vehicle dashcam.   (Exhibits 1, 2, 3 to ECF No. 69).   The files are overlapping to a certain extent.   A short summary of the content of the videos is included below.   The quality of the videos is less than desirable and Hurst and the officers were in a shaded area at the scene.

**On the fifth USB file,** Officer Pahmiyer is driving to the scene.   When he arrives, Officer Yager and one other officer are already present.   Hurst is not in view on this file.   However, Hurst

---

7 "[A] discoloration of the skin resulting from underneath, typically caused by bruising."   *Oxford Languages Dictionary.*

can be heard complaining about his drinking water making him sick because it is contaminated with salt.   He says he went by Tyson's that day and was given some drinking water.   He indicates he fell and hit his head hard.   He asks that an ambulance be called.   He indicates he needs to go home and get his blood pressure medication.   He states he does not get treated when he is in the BCDC.   He complains he could not even put his hat on—presumably because of his head injury. He says could not walk more than five feet without his vision going.   When advised he had a warrant out of the Bentonville, Hurst stated he had not had court there; he had no money; no ride; and was trying to get healthy.

At this point, Detective Yager asks Officer Pahmiyer to move his patrol car closer since Hurst indicated he could not walk.   Hurst begins to talk about a stockbroker having stolen 29,000,000 shares from him.   He states that his Father was murdered and all the shares transferred. Hurst indicates he should be taken to either the Springdale or the Bentonville hospital.   He complained again that he had hit his head hard and his shoulder was hurting.

**On the first USB file**, Officer Pahmiyer arrives at the scene in his patrol vehicle and walks up to Hurst and the other two officers.   Initially, Hurst can be heard, but not seen, saying he could not put his hat on; he could not stand up and walk for five feet; he needed his lisinopril, his blood pressure medication, that was at his house; the water in his house had salt in it; he was advised he had a warrant out of Bentonville; he claimed he did not have court in Bentonville; he needed to talk to the judge about his poisoned water; he needed to go to the hospital; he was trying to get healthy; he could not go to jail because they do not give me blood pressure medication; he hit his head hard and needed to be taken to the hospital; and he begged the officers not to take him to jail without first being treated.   Officer Pahmiyer is asked to bring his patrol vehicle closer since Hurst

said he cannot walk.   When Hurst comes into view, he is kneeling.



He was patted down.   At this point, Hurst's torso is leaning forward over his knees.   He was told to sit back so that his jacket could be taken off.

Detective Yager moves to Hurst's left side and Officer Pahmiyer to the right.   Hurst complains that his shoulder was pulled behind him in 2001.   He complains he cannot put his arms behind his back because of his shoulder.   He continues to protest that he needs to go to the hospital.



Hurst was placed on the ground and his arms put behind him in order to be handcuffed.

Hurst continues to protest stating he needs to go to the hospital.   Hurst begins saying ohhh, ohhh,

repeatedly and complaining first about his wrist and then about his head.   He was told to relax

and breathe.   Hurst repeatedly complained about his head.



Once his hands are secured behind his back, Hurst is rolled over towards Detective Yager and the officers begin the process of assisting Hurst to his feet.   The officers indicate they will help him.   As he is helped to his feet, Hurst asserts that he has to go to the Springdale or Fayetteville hospital.   He indicates that if he is taken to the county jail he will not be treated. Hurst is asked to put legs under himself.   Detective Yager counts to three and Hurst is brought to his feet.   Hurst complains about his shoulder as he is being walked to the patrol vehicle.   Hurst complains again about his shoulder.



Hurst denies being on any drugs and states he needs his medication.   Hurst is told they will go get his medicine.   Hurst continues to state that an ambulance should be called.   Hurst has a receding hairline; the hair is thin on the top of his head; shorter on the sides; and longer, thicker, and curlier from the crown of his head to the nape of his neck, and long enough to reach the collar of his coat and/or shirt.

At this point, Hurst can no longer be seen on this video but can be heard.   Hurst was helped to the back seat of patrol vehicle and protests being buckled in.   Hurst again states he fell

13

on his head and shoulder.   He stated he had a stomach hernia.   Because of these conditions, Hurst said he could not sit in an upright position.

Hurst begins talking about the salt in his water; his Father being murdered; his inability to walk more than four feet; he repeatedly asserts he needs to be taken to the hospital; he indicates he needs surgery on his wrist; he fell on his head; if he doesn't get his blood pressure medication, he is going to have a stroke; his hips going out; and the inability to obtain medical care at the BCDC.

Both Officer Pahmiyer and Officer Yager drive to Hurst's residence.   Hurst's mother is outside the home when they arrive. Officer Yager exits his vehicle and speaks with Hurst's mother and looks for the blood pressure medicine.   Hurst calls out to his mother that he needs to go to the hospital, and he needs her to look at his head.   He asks her to get him out of jail.   She does not approach the patrol vehicle or look at Hurst's head.   Hurst complains his head hurts "like hell." At one point, Officer Yager approaches Officer Pahmiyer's vehicle and asks Hurst where the medication can be found.   Hurst asks to be taken in the house but is told that is not possible.   The medication is located and handed to Officer Pahmiyer.

Officer Yager returns Hurst's jacket and guitar to Hurst's mother.   Officer Yager continues talking to the mother about Hurst's situation and what, if anything, can be done to help him.

While Officer Pahmiyer is driving Hurst to the BCDC, he receives a phone call.   Officer Pahmiyer relates some of Hurst's complaints including his complaint that he fell and has a hole in his head.   Officer Pahmiyer opines that none of Hurst's claims about his medical condition sound legitimate.

**On the sixth USB file,** the camera in the patrol vehicle is aimed at the back seat and the grill separating the seats can be seen.   Hurst has not yet been placed in the patrol vehicle.   Hurst can be heard complaining that he cannot walk and they need to pull the cruiser up or carry him. Hurst complains he is "super constipated;" there is something in his water; and his head hurts badly.

**On the second USB file**, Hurst can be seen lying across the back seat with his head against the door on the driver's side of the vehicle.   He rests the back of his head against the inside of the door.   There is no visible blood.   Hurst is frequently moving his head and shoulders around. When Hurst is talking, he moves his head from side to side.   Hurst is also kicking his legs up and down.

**On the third USB file**, Officer Pahmiyer arrives at the BCDC.   Officer Pahmiyer asks for assistance in getting Hurst out of the vehicle as he is saying he cannot walk.   Hurst repeatedly objects to not having been taken to the hospital.   He states he fell and his head needs to be looked at.   He complains that no one has looked at his head.   He repeatedly asks for someone to look at his head.   He indicates that the injury could not be seen through all of his hair and someone needed to part his hair to look at the injury.

Hurst indicates he needs his blood pressure medication so he doesn't have a stroke.   He complained his heart was already starting to hurt.   He indicates he is about to pass out.   Hurst repeats that he is not high on any substance but needs his blood pressure medication and pain medication for the pain in his head and shoulder.

Hurst was told to calm down and a nurse would look at him.   Remarks are made by various

15

officers about Hurst's past erratic behavior.

**On the fourth USB file,** Hurst is being removed from the back seat and is supported on both sides by officers.  Hurst tells the officers he fell and asks then to look at his head.  He complains that his neck was f----- up.  He indicates he is about to pass out.

**USB files seven and eight,** cover the period of time while Officer Pahmiyer's patrol vehicle is parked at Hurst's home.  Officer Yager can be heard talking to Hurst's Mother. Information relevant to Hurst's claim against Officer Pahmiyer has been described in connection with the other USB files.

### C.   Application of the Law

Officer Pahmiyer has moved for summary judgment on the following grounds:   First, with respect to the denial of medical care claim, he argues that Hurst was not suffering from an objectively serious medical condition, simultaneously maintaining that he was not deliberately indifferent to Hurst's medical needs.   Second, with respect to the unlawful arrest claim, Officer Pahmiyer argues he had probable cause to arrest Hurst for public intoxication and maintains that Hurst's guilty plea to the charge of public intoxication bars this claim.   Officer Pahmiyer next argues he did not use excessive force against Hurst.   Finally, and alternatively, Officer Pahmiyer contends is entitled to qualified immunity as to all causes of action.

### (1)   Medical Care Claim

At the time of his encounter with Officer Pahmiyer, Hurst was an arrestee.   Historically, cases in the Eighth Circuit have analyzed denial of medical claims brought by arrestees and pretrial detainees under the Due Process Clause of the Fourteenth Amendment.   *See e.g., Carpenter v. Gage,* 686 F.3d 644, 650 (8th Cir. 2012).   While the Eighth Circuit has indicated it is an open

issue in this circuit whether the claims of arrestees should be analyzed under the Fourth Amendment's objective reasonableness standard rather than the Due Process Clause of the Fourteenth Amendment,[8] courts in this circuit have continued to analyze Fourteenth Amendment Due Process medical care claims under the deliberate indifference standard of the Eighth Amendment. *See e.g., Morris v. Cradduck*, 954 F.3d 1055, 1055 (8th Cir. 2020) (pretrial detainee has the same rights to medical care under the Due Process Clause as an inmate has under the Eighth Amendment). Arrestees possess at least the same rights to medical care as those of pretrial detainees and convicted inmates. *Barton v. Taber,* 820 F.3d 958, 967 (8th Cir. 2016) (*Barton I*) (applying the Eighth Amendment to an arrestee's denial of medical care claim). The Court therefore examines Hurst's claims under the Eighth Amendment's deliberate indifference standard. *Morris,* 954 F.3d. at 1058.

To succeed on this type of claim, Hurst must demonstrate (1) that he had an objectively serious medical need, and (2) that Officer Pahmiyer actually knew of, but deliberately disregarded, that serious medical need. *See Ivey v. Audrain Cnty., Mo.,* 968 F.3d 845, 848 (8th Cir. 2020) (cleaned up). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997). "To demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff

---

[8] *See e.g., Bailey v. Feltmann,* 810 F.3d 589, 593 (8th Cir. 2016)(noting that it was unresolved if "an arrestee's claim alleging denial of medical care is analyzed under the Due Process Clause or the Fourth Amendment" but concluding that a "right under the Fourth Amendment against unreasonable delay in medical care was not clearly established in March 2012." The court thought it "prudent to avoid addressing the proper constitutional standard unnecessarily"); *Awnings v. Fullerton,* 912 F.3d 1089, 1101-1102 (8th Cir. 2019)(Noting the unresolved issue but concluding that any "denial of medical care incident to Awning's arrest ended when he was actually received medical attention at the hospital." Further, noting his claim against the officer was based on his failure to convey to jail official's that Awning needed a follow-up medical appointment. Due Process Clause under the Fourteenth Amendment applied and claim analyzed under the deliberate indifference standard).

must establish a mental state akin to criminal recklessness:   disregarding a known risk to the [arrestee's] health."   *Barton v. Taber,* 908 F.3d 1119, 1124 (8th Cir. 2018)(*Barton II*)(cleaned up).   The Eighth Circuit has stated that this "onerous standard requires a showing more than negligence, more than even gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate."   *Thompson v. King,* 730 F.3d 742, 747 (8th Cir. 2013) (cleaned up).

Hurst also must assert a physical injury that is greater than *de minimis* to make a claim under the Eighth Amendment.   *Irving v. Dormire,* 519 F.3d 441, 448 (8th Cir. 2008) ("Claims under the Eighth Amendment require a compensable injury to be greater than *de minimis"*).   The physical injury requirement of 42 U.S.C. § 1997e(e) bars a prisoner from recovering compensatory damages for mental and emotional injury in the absence of a physical injury, and the Eighth Circuit has interpreted § 1997e(e) to require more than a *de minimis* physical injury before compensatory damages may be recovered.   *McAdoo v. Martin,* 899 F.3d 521, 525 (8th Cir. 2018).

The first prong of the deliberate indifference test requires the Court to decide if there is a genuine issue of material fact as to whether Hurst suffered from an objectively serious medical need.   The Court does not believe the factual record supports that Hurst had an objectively serious medical need.   Hurst maintains it was his head injury that should have prompted Officer Pahmiyer to provide medical treatment prior to taking him to the BCDC.   While Hurst repeatedly demanded medical care and complained of a variety of medical conditions in the presence of Office Pahmiyer, Hurst testified at his deposition that there was no blood flowing from his ears; there was no blood visible on his head, neck, or face; and that the injury to his head could not be seen until he shaved his head several days later as it was hidden by his hair.   (ECF No. 69-5 at 2; ECF Nos. 75-6 at 29,

32, 47, & 66).   Additionally, as reflected in the third USB video file, Hurst says his injury can only be seen if his hair is parted.   While Hurst denies he was intoxicated or high on any drugs, Hurst admits that when he does not take his blood pressure medication, people have equated his behavior to that of a person high on methamphetamine.   (ECF No. 69-6 at 2-3).   Not every arrestee who appears to be intoxicated needs immediate medical attention.   *See e.g., Barton I,* 820 F.3d at 969 (Colloton, J., dissenting)("The Constitution does not require an arresting law enforcement officer to seek medical treatment for every arrestee who appears to be intoxicated").

Hurst argues that his serious medical condition was obvious, basing that on (a) the results of his physical examination the following day which revealed some "soft tissue swelling, ecchymosis to left parietal occipital" and (b) his ultimate diagnosis of a "closed head injury" provided by the emergency room doctor.   (ECF Nos. 69-3 at 2 & 4)(ECF No. 87 at 1-2).   Hurst also says he had developed a three inch "bump" which felt like a "hole in my head."   (ECF No. 87 at 2).   The Court disagrees.   As Hurst's soft tissue injury and bruising were not readily visible to Officer Pahmiyer, the Court does not believe Hurst's subsequent diagnosis (arrived at with the aid of diagnostic imaging) establishes that conditions existed which would have indicated to a layperson such as Officer Pahmiyer that Hurst needed medical treatment.   Importantly, Hurst can be seen in the videos to be moving his head around freely, leaning the back of his head against the door of the patrol vehicle, and frequently moving his torso and legs. While Hurst exhibits signs of agitated behavior, he does not exhibit any signs of medical distress – Hurst does not hold his head as if it was hurting; make motions such as one would expect if stemming flowing blood; or in any other way indicate by his actions that he was suffering from a "bump" or "hole" or other head injury.   To the contrary, it is undisputed that Hurst made clear he wanted to go to the hospital and

19

not the jail, venting his anger at being taken into custody.   The Court does not believe there is a genuine issue of material fact as to whether Hurst suffered from an objectively serious medical need.

Even if the Court assumes Hurst's complaints regarding his head injury constitutes an objectively serious medical need, he cannot meet the second prong of the analysis which requires Hurst to illustrate deliberate indifference on the part of Officer Pahmiyer.   "[I]t is not enough merely to find that a reasonable person would have known about the risk, or that the officer should have known about the risk.   Even acting unreasonably in response to a known risk is not sufficient to prove deliberate indifference." *Thompson v. King,* 730 F.3d 742, 747 (8th Cir. 2013)(cleaned up).   Only when "a response to a known risk is obviously inadequate" may this "lead to an inference that the officer recognized the inappropriateness of his conduct." *Id.*   Here, the involved officers, including Officer Pahmiyer, indicate they had frequent contact with Hurst over the years and that he often exhibited erratic behavior and espoused delusional beliefs.   Hurst exhibited no visible injuries, and he could and did answer basic questions and follow basic instructions.   Officer Pahmiyer reasonably believed that Hurst would be assessed by medical personnel upon his admission to the BCDC.   (ECF No. 69-7 at 3).

When a prisoner is alleging a delay in medical treatment, he must "present verifying medical evidence that the [official] ignored an acute or escalating situation or that [these] delays adversely affected his prognosis." *Holden v. Hirner,* 663 F.3d 336, 342 (8th Cir. 2011).   No such evidence exists in this case.   Hurst was seen at the hospital on the day following his arrest, was evaluated, and released with only over-the-counter medication.   The Court does not believe this amounts to an injury that is more than *de minimis.*   For these reasons, the Court concludes there

is no genuine issue of material fact as to whether Officer Pahmiyer exhibited deliberate indifference to Hurst's serious medical needs.

In the alternative, Officer Pahmiyer argues he is entitled to qualified immunity on this claim.   "Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341-43 (1986)).   Having found that the facts do not make out a constitutional violation, Officer Pahmiyer is entitled to qualified immunity on Hurst's denial of medical care claim.   *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

**(2)   False Arrest Claim**

With respect to Hurst's claim of false arrest, Officer Pahmiyer contends he had probable cause to arrest Hurst for public intoxication.   Additionally, Officer Pahmiyer maintains that Hurst's guilty plea to the charge bars this claim.

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least arguable probable cause." *Kingsley v. Lawrence Cnty, Mo.,* 964 F.3d 690, 697 (8th Cir. 2020)(cleaned up).

> Probable cause to make a warrantless arrest exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.   Arguable probable cause exists when an officer mistakenly arrests a suspect believing it is

based in probable cause if the mistake is objectively reasonable.

*Id.* at 697-98 (cleaned up).

Officer Pahmiyer contends he had probable cause to arrest Hurst for public intoxication under Ark. Code Ann. § 5-71-212(a).   A person commits this offense if:

> he or she appears in a public place manifestly under the influence of alcohol or a controlled substance to the degree and under the circumstances such that:   (1) The person is likely to endanger himself or herself or another person or property; or (2) the person unreasonably annoys a person in his or her vicinity.

Ark. Code. Ann. § 5-71-212(a).   Based on Hurst's erratic behavior; his lying down on the property of another; and his loud and boisterous speech about topics such as being poisoned by the water at his home and the murder of his father all contributed to Officer Pahmiyer's belief that Hurst was under the influence of alcohol or a controlled substance.   The Court believes there existed, at a minimum, arguable probable cause to charge Hurst with public intoxication.

Moreover, it is undisputed that Hurst subsequently pled guilty to the public intoxication charge.   This plea forecloses Hurst's claim that he was arrested without probable cause.   *Malady v. Crunk,* 902 F.2d 10, 11-12 (8th Cir. 1990); *Williams v. Schario,* 93 F.3d 527, 528-29 (8th Cir. 1996).   Although Hurst now argues that he did not know what charge he was pleading guilty to (ECF No. 88 at 9), the undisputed fact is that Hurst entered the guilty plea, and it has not been set aside.

### (3)   Excessive Force Claim

Officer Pahmiyer argues he did not use excessive force against Hurst.   He contends that only an objectively reasonable amount of force was used to arrest and put Hurst into handcuffs and to assist Hurst into his patrol vehicle.   Officer Pahmiyer maintains the video evidence establishes conclusively that only the amount of force necessitated by the situation was employed.

The Fourth Amendment's "objective reasonableness" standard applies to excessive force claims brought by arrestees. *MacKintrush v. Pulaski Cnty. Sheriff's Dep't.,* 987 F.3d 767, 770 (8th Cir. 2021). "[T]he defendant's state of mind is not a matter that a plaintiff is required to prove." *Kingsley v. Hendrickson*, 576 U.S. 389, 394 (2015)(applying objective reasonableness standard to a pretrial detainee). The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.*; *see also Hicks v. Norwood,* 640 F.3d 839, 842 (8th Cir. 2011). "[O]bjective circumstances potentially relevant to a determination of excessive force" include:

> the reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397 (citing *Graham* 490 U.S. at 396); *see also MacKintrush,* 987 F.3d at 770. An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests, such as maintaining order and security, or is excessive in relation to that objective. *Kingsley,* 576 U.S. at 398-99. The nature or quantum of the force must be the focus of the Court's inquiries. The absence of injury is a factor the Court considers in determining whether excessive force was used. The Court must also keep in mind that the mere fact that injuries occurred does not support an excessive force claim if they are the result of a "*de minimus* use of force." *Hunter v. Namanny*, 219 F.3d 825, 831 (8th Cir. 2000).

In the context of the use of handcuffs, the Court of Appeals for the Eighth Circuit has made

it clear that a detainee must suffer more than *de minimus* injuries to support an excessive force claim. *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011). This is true because the use of handcuffs or other physical restraints frequently results in minor injuries to the inmate. *Id.* In *Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003), the Eighth Circuit rejected an excessive force claim when, as a result of handcuffing, the only injury shown was some bleeding. *Id.* It noted there was no evidence of "long term or permanent injury." In *Foster v. Metro. Airports Comm'n.,* 914 F.2d 1076 (8th Cir. 1990), the Plaintiff maintained he had suffered "nerve damage" in his arms as a result of being in handcuffs. *Id.* at 1082. The Eighth Circuit rejected the claim noting that the Plaintiff presented "no medical records indicating he suffered any long-term injury as a result of the use handcuffs." *Id.* The Court noted that the Plaintiff's "allegations of pain as a result of being handcuffed, without some evidence of more permanent injury," were insufficient to support an excessive force claim. *Id.*

According to Hurst, Officer Pahmiyer "put his knees into me and pulled on me when he cuffed me" causing something to tear in Hurst's side. (ECF No. 69-6 at 4 & 6). No argument is made that Hurst was actively resisting the arrest; nevertheless, Hurst indicated to the officers that he was unable to stand on his own and was unable to obey the orders of the officers without their assistance. There is no evidence that Hurst mentioned an injury to his side when (a) he is placed in the patrol vehicle, (b) during his transport to the BCDC, or (c) when his intake medical questionnaire was completed. There is nothing in the record to suggest Hurst sought medical treatment for any injury to his side either at the BCDC or when Hurst was seen at the hospital on April 21, 2019. While Hurst maintains he did not mention his side injury at the hospital because he believed it would keep him from obtaining treatment for his head injury, Hurst neither argues

nor illustrates that he ever sought medical treatment for the injury to his side.   Moreover, nothing on the videos illustrates or suggests use of any excessive force against Hurst while he is being handcuffed or escorted to the patrol vehicle.   To the contrary, the video indicates officers displayed patience with Hurst and did not treat him in a heavy-handed manner.   Without any medical records supporting Hurst's excessive force claim, the foregoing cases dictate the conclusion that the amount of force employed was objectively reasonable under the circumstances. Officer Pahmiyer is entitled to summary judgment in his favor on Hurst's excessive force claim. Moreover, having found no constitutional violation, Officer Pahmiyer is entitled to qualified immunity.   *Krout*, 583 F.3d at 564.

### III.   The Benton County Defendants' Motion for Summary Judgment

The Benton County Defendants, Corporal Levi Franks, Sergeant Greg Hobelmann, and Deputy James Sikes, have moved for summary judgment on the following grounds:   First, they argue that no excessive force was used against Hurst when he was removed from his cell and placed in a restraint chair.   They then maintain Defendants were not deliberately indifferent to Hurst's serious medical needs.   Defendants then contend they are entitled to qualified immunity on each of the claims. Fourth, they assert there is no basis for any official capacity liability and finally, these Defendants argue that negligence does not state a constitutional claim.

### A.   Summary of the Facts

When Hurst was being taken to the BCDC on April 20, 2019, he was patted down.   (ECF No. 75-6 at 29).   At the time, if there was any blood from his head wound, it was obscured by Hurst's hair.   *Id.*; *see also* USB video file 3.   Hurst's intake form was completed by Deputy Sikes at 10:14 a.m.   (ECF No. 75-2 at 16).

Hurst was placed in a holding cell by himself.   (ECF No. 75-6 at 30-31.   Hurst laid down on the cell floor and was quiet.   *Id.* at 31.   He maintains he had a "massive head concussion." *Id.*   When he was checked on hourly, Hurst testified he asked for his lisinopril and for his head to be checked.   *Id.*   During one of the hourly checks, Hurst indicated that Nurse Nadia Malapha looked at him either through the window or by standing at the cell door, said there was nothing wrong with him, and then walked off.   *Id.* at 32-33.   According to Hurst, he asked her to please touch his head but she would not touch him.   *Id.*   Hurst was allowed to call his mother but only got her voicemail.   (ECF No. 75-6 at 71).   He asked her to take him to the hospital because he was sick and "something [was] killing him."   *Id.*

According to BCDC policy, "[a]rriving detainees determined to be in need of critical or emergency medical, mental, or dental care, <u>are not</u> [] accepted into the facility, and remain in the custody of the arresting or transporting deputy."   (ECF No. 75-5 at 18)(emphasis in original).   If it is determined the detainee is in need of "critical care . . .   the detainee is not accepted."   *Id.* at 19.   Hurst was accepted into custody and placed in a holding cell.   (ECF No. 75-2 at 16).

At approximately 3:00 p.m. on April 21, 2019, Corporal Franks and Deputy Sikes went to cell 5 to try to get Hurst booked in.   (ECF No. 75-4 at 1).   According to the jail incident reports, Hurst was lying face down on the floor.   *Id.*   Hurst was twice ordered to stand so he could be booked into the system.   *Id.*   Hurst refused each time saying he could not get up.   *Id.*   Corporal Franks took Hurst's left arm and Deputy Sikes took Hurst's right arm to stand him up and escort him to the booking counter.   *Id.*   Once he was standing, Hurst went limp and dropped to his knees.[9]   *Id.*   The officers tried to stand Hurst up a second time but Hurst "resisted by trying to

---

[9] Contrary to the video evidence and Corporal Frank's incident report, Deputy Sikes' supplemental narrative to the incident report indicates Hurst was escorted to the booking counter and then "tried to go limp."   (ECF No. 75-4 at 1).

stay on the ground." *Id.* Due to Hurst's passive resistance, Corporal Franks made a call to place Hurst in the pro-restraint chair. *Id.* Hurst was booked in while in the restraint chair. *Id.* After Hurst calmed down, he was removed from the restraint chair. *Id.* Hurst was then fingerprinted and escorted back to his cell. *Id.*

Hurst tells a contrasting story about the encounter with Corporal Franks and Deputy Sikes. Prior to being placed in the restraint chair, Hurst testified he was merely lying on the ground and not endangering himself or anyone else. (ECF No. 75-6 at 28). Hurst denies he was ever asked to stand up and go to booking. *Id.* at 34-35. Had he been asked, Hurst states he would have stood up to be booked. *Id.* at 35. When Hurst was forced up, he contends Deputy Sikes twisted his arm or wrist in such a manner that his arm would have been broken if he had not stood up. *Id.* at 28 & 34. When he was being placed in the chair by Deputy Sikes and Corporal Franks, Hurst testified the chest strap was pulled across the back of his neck and cinched or yanked down as fast and hard as Deputy Sikes could causing the chair to violently shoot forward. (ECF No. 75-6 at 26, 28, 36 & 60-61). Hurst indicates that before the strap was yanked down, he told both officers that the strap was behind his head. *Id.* at 36, 38, & 59-61. Hurst states that Corporal Franks just stood there watching the whole thing. *Id.* at 60. Hurst testified he suffers from neck pain now "24/7." *Id.* at 28-29. In fact, Hurst testified the pain extends "all the way down" his spine. *Id.* at 61. Hurst estimates he was in the restraint chair approximately fifteen minutes. *Id.* at 38. When he was wheeled over to be fingerprinted, Hurst testified he was told if he did not get up and cooperate, they would make "it worse" for him. (ECF No. 75-6 at 39). When Hurst was put back into the cell, he laid down. *Id.* at 42.

---

At this point, Deputy Sikes indicates Hurst was placed in the restraint chair. *Id.*

A medical questionnaire was completed at 3:34 p.m. and it was noted that Hurst reported "right wrist poss broken upon arrest hit head prior to arrest hurt back." (ECF No. 75-2 at 6). On the form in the place for the inmate's signature, "placed in chair" was noted. *Id.* A mental health screening questionnaire was completed at the same time. *Id.* at 7. Hurst was not placed in a housing unit that day "so he filed no grievances or requests and no medical file was created." (ECF No. 75-1 at 1). Similarly, Hurst testified he was never allowed to be around a computer so he could file a grievance. (ECF No. 75-6 at 76). His personal property inventory sheet was completed at 6:01 p.m. (ECF No. 75-2 at 18).

Hurst was released from the BCDC on April 21, 2019, at 6:19 p.m.[10] (ECF No. 75-2 at 2). Hurst went across the road to a Casey's convenience store, got a ride to Decision Point and rang the doorbell and told the man who answered it what had happened to him and stated he needed help. (ECF No. 75-6 at 40-42). The man felt the bump on Hurst's head and stated that he needed an ambulance. *Id.* at 42. Hurst did not call an ambulance from Casey's because of its proximity to the BCDC. *Id.* at 41. He felt he would not receive treatment if he said he was injured by a law enforcement officer. *Id.*

Hurst arrived at Mercy Hospital by ambulance at 8:44 p.m. (ECF No. 69-3 at 1). As noted above, on physical examination some "soft tissue swelling and ecchymosis to the left parietal occipital" was noted. *Id.* at 2. Hurst did not mention any injury to his neck while being seen at the emergency room. (ECF No. 69-3 at 1-7)(ECF No. 75-6 at 46). He felt that if he had told them about how his neck injury occurred, they would not treat his head injury. (ECF No. 75-6 at 46). Hurst testified he was given aspirin or something similar. (ECF No. 75-6 at 45). Two days

---

[10] Hurst testified he believed he was released in the morning. (ECF No. 75-6 at 40). However, the release report and emergency room admission report indicate he was released later in the day.

later, Hurst shaved his head.   (ECF No. 75-6 at 25 & 47).   Hurst testified then the bump and "two gashes on both sides" could be seen.   *Id.*   Hurst was not incarcerated between April 2019, and June 6-9, 2019, when he was incarcerated for "punching" a police officer.   *Id.* at 50 & 74-75.

During those periods of time when he was not incarcerated, Hurst initially testified that he "probably" did not seek treatment for his head or neck.   *Id.*   Hurst testified he did not have a way to get there; he had no money; and his brother refused to take him.   *Id.* at 50-51.   He later recalled having gone to an urgent care across from Washington Regional in Fayetteville approximately three weeks after his emergency room visit on April 21, 2019.   *Id.* at 52-53.   According to Hurst, as soon as he mentioned his neck injury was caused by the Bentonville Sheriff's Department, he was told they would not treat him and ordered out of there.   *Id.* at 53 & 62-63.   Hurst's blood pressure medication was refilled over the phone.   *Id.* at 54.   He did not go to Washington Regional because on another occasion he underwent a forced catheterization there.   *Id.* at 52.

Hurst was seen at the emergency room of Mercy Hospital Northwest Arkansas on June 9, 2019.   (ECF No. 69-4 at 1).   Hurst's primary complaint was altered mental status.   *Id.* at 2.   In the comments section, it is noted that Hurst was on methamphetamine, had head pain, and had been found in someone else's yard naked.   *Id.*   Hurst believed he was trying to save a girl from a pool.   *Id.*   This is noted not to be a true story.   *Id.*   He was found to have a laceration to his head. *Id.*   A CT of his head was done.   *Id.* at 3.   No acute intracranial abnormality was found.   *Id.* Hurst's diagnosis was listed as methamphetamine abuse and an unspecified altered mental status. *Id.* at 3.

Hurst remained freeworld until July 12, 2019, when he was incarcerated for approximately four months.   (ECF No. 75-6 at 75).   Hurst has been continuously incarcerated since November

13, 2019,[11] when he burned his house down.   *Id.* at 50-55 & 63.   He was charged with breaking and entering for taking a jacket out of a neighbor's vehicle so he could stay warm.   *Id.* at 57-58. During these incarcerations, Hurst felt sure he asked for treatment for his neck.   *Id.* at 77-78. However, he states he was never seen by the doctor.   *Id.* at 78.   Since he became reincarcerated on November 13, 2019, Hurst testified he has received Tylenol and muscle relaxers for his neck. (ECF No. 75-6 at 63).

Sergeant Hobelmann was added as a Defendant through a supplement to the Complaint (ECF Nos. 25 & 97).   Hurst alleges review of the restraint chair video shows that Sergeant Hobelmann was present.   Hurst notes that the rules require Sergeant Hobelmann to supervise when an inmate is put in the restraint chair.   In Hurst's opinion Sergeant Hobelmann is "clearly . . . doing nothing."   *Id.*   Hurst asserts that Sergeant Hobelmann was negligent in his job duties. *Id.*

### B.   The BCDC Policies

The policies of the BCDC allow an inmate to "be restrained to a chair with the approval of the shift supervisor when the inmate's conduct is violent and dangerous to others when unrestrained, or the inmate poses a serious risk to the security and good order of the facility." (ECF No. 75-1 at 2).   The chair is used "to provide safe containment of inmates exhibiting violent, violent prone or uncontrollable behavior, or to enhance the safety of inmates and staff."   (ECF No. 75-5 at 1 (Policy 6.05)).   The term restraint chair is defined in BCDC Policy 6.05 as "[a] movable or stationary chair ergonomically designed and used to safely restrict movement of violent, violent prone, uncontrollable, or uncooperative inmates who pose a potential risk to

---

[11] In a second deposition, Hurst refers to this date as November 12, 2019.   (ECF No. 79-2 at 7).

themselves or others." *Id.*    The chair is only to be used when "other control techniques such as *deputy presence, verbal commands,* and *soft hand* have not been effective. *Id.* (emphasis in original).   When placing an inmate in the chair, care is to be taken "not to wrap straps around [the] inmate's head or neck." *Id.* at 4.   Once placed in the chair, deputies are to "follow-up with facility medical staff, if available at the facility." *Id.* at 2.   The chair may be used to move an "uncooperative inmate safely from one section of the facility to another." *Id.*   After being placed in the chair the inmate is to be kept "under frequent, close and personal observation." *Id.*   The "facility health professionals" are to be contacted "if there are medical or health care concerns regarding placement of the inmate in the chair." *Id.* at 3.   If a "health care professional" is "on duty during the period the inmates is in the chair, the Shift Sergeant or the Booking Sergeant notifies the health care provider." *Id.*

The BCDC's use of force policy provides that "[d]eputies only use the amount of force reasonably necessary to bring inmates into compliance, protect life, and protect the integrity of the facility."   (ECF No. 75-5 at 6).   The BCDC has a five level "Response to Resistance Ladder or *force continuum." Id.* at 10 (emphasis in original).   Level 2 deals with a passively resistant inmate and provides:   "*The* most appropriate level of response is *contact controls,* including *strong or forceful soft hand, hand and arm holds pressured physical movement of the inmate, forced removal from his cell or area*, etc." *Id.*   With respect to the restraint chair, the use of force policy provides:   "An inmate may be restrained to a chair with approval of the shift supervisor when that inmate's conduct is violent and dangerous to others when unrestrained, or the inmate poses a serious risk to the security and good order of the facility." *Id.* at 13.

### C.  Video Evidence

The video offers a 360° view of the booking area of the BCDC.   There is no audio.   At 3:27:59 p.m. on Sunday, April 21, 2019, three officers approach a cell door.   The door is opened and the officers appear to be giving instructions.   A fourth officer approaches at 3:28:37. One of these officers has been identified by Defendants as Sergeant Hobelmann and the other as an unnamed officer (ECF No. 75 at 2); however, the Court has no information on which of the two additional officers is Sergeant Hobelmann.   *Id.*

At 3:28:50, two officers, Corporal Franks and Deputy Sikes enter the cell.   The inside of the cell cannot be seen.   An unnamed officer brings the restraint chair to the cell door at 3:29:34.

At 3:29:53, Hurst, who is being supported by Corporal Franks and Deputy Sikes, is led out of the cell to the restraint chair.   At 3:29:55, Hurst is placed into the chair.   One officer is on each side.   The third officer moves to the back of the chair.   At this time, the fourth officer is standing by the cell door.



It is obvious that Hurst is talking to the deputies.   The officers secure Hurst's arms to the chair.   Hurst appears to be talking in an aggravated manner with the officers responding. Beginning at 3:30:57 and lasting until approximately 3:31:04, Hurst can be seen raising and/or kicking his legs.   Hurst is moving his head up and down and side to side.   Next, the waist strap

is secured.   Both Corporal Franks and Deputy Sikes get down on their knees and are securing the

leg straps.



At 3:31:15, the officer standing behind the chair reaches from behind Hurst's head with

the shoulder strap in his hand.   Two straps are brought over Hurst's shoulders.



At this point, one of the officers is standing at a place that is partially blocking the camera's

view.   At 3:31:07, Hurst pulls his head towards the back of the chair.

33



Hurst then can be seen with his head above his shoulders.   At 3:31:45, the officer standing behind the chair again brings the straps over Hurst's shoulders with Deputy Sikes assisting.



The strap where it is comes from the back of the chair is sewn into a single strap that separates behind Hurst's head into two straps that act as the shoulder restraints.



The straps are placed on each shoulder and then are secured by Deputy Sikes and Corporal Franks.   The position of the officer on Hurst's right side is such that Hurst's head and shoulders

34

are largely hidden from view.   The officers begin securing the shoulder straps to the base of the chair.   At approximately 3:31:57, when only the top of Hurst's head can be seen briefly, it does appear that his head moves suddenly forward and then back.   The chair does not move at all. By 3:32:04, Hurst is fully restrained.

Hurst is wheeled up to the booking desk at 3:32:28.



One officer is typing information into the computer.   Hurst does not appear agitated and is not struggling against the straps.   Hurst appears to be talking and is moving his hands.   He frequently nods his head and lets his head fall forward.   Corporal Franks and Deputy Sikes who had been standing at Hurst's sides walk a few feet from Hurst's left side.   At 3:33:55, Hurst leans his head back and opens his mouth wide as if he is yelling or in pain.



The officers do not react and the booking process continues.     At 3:34:06, Corporal Franks and Deputy Sikes return to their positions on each side of the restraint chair.   Hurst continues to freely move his neck, head, and hands.   At 3:36:47, Hurst is wheeled away from the booking desk and toward the fingerprint room.   The officers talk to him.

At 3:38:01, Corporal Franks and Deputy Sikes begin removing Hurst from the restraint chair.   Hurst is assisted up and the officers hold Hurst's upper arms as he walks through a doorway to have his booking photographs taken and to be fingerprinted.   Although Hurst appears to be somewhat unsteady, he is able to stand against the wall by himself.

At 3:53:47, Hurst walks out of the fingerprinting room guided by a single officer.   They cross the hall and Hurst is returned to a cell.

### D.   Application of the Law

### (1)   Excessive Force Claim

The applicable objective reasonableness standard was set forth above and will not be repeated here.   It is recognized that the use of force may be justified "to make an inmate comply with a lawful prison regulation or order, but only if the inmate's noncompliance also poses a threat to other persons or to prison security." *Treats v. Morgan*, 308 F.3d 868, 875 (8th Cir. 2002). Thus, while force may be used to ensure compliance with valid orders, "correctional officers do not have a blank check to use force whenever a prisoner is being difficult." *Id.*

The question here is whether the force used to affect Hurst's removal from the cell and to secure him to a restraint chair was objectively reasonable.   Defendants maintain their use of force was objectively reasonable in light of Hurst's refusal to stand up and walk out of the cell to be booked in.   They maintain Hurst refused to comply with their valid orders resulting in the reasonable and appropriate use of force to gain his compliance.

Hurst disagrees, maintaining he posed no threat to himself or others and was merely lying on the floor of the cell because he felt ill because of his head injury.   Hurst testified he was never given an order to stand and walk out of the cell to be booked in.   Instead, he says Deputy Sikes and Corporal Franks entered the cell while he was lying on the cell floor.   Deputy Sikes then twisted his arm with such force Hurst believed that if he did not stand up his arm would be broken. Hurst states he was then immediately taken to the restraint chair.   While being strapped to the chair, Hurst maintains the one strap was behind his neck (about which he says he informed the officers) and the strap was jerked on by Deputy Sikes so violently that it caused injury to his neck and caused the chair to jerk forward.

37

While the Court has been provided with video evidence, the video contains no audio, it does not show the inside of the cell, and when the strap was allegedly jerked violently against his neck the camera view is partially obstructed.   This leaves the Court with opposing stories told by the Hurst and the Defendants.   The conduct of Hurst at the time the use of force was initiated is of the utmost importance. *See e.g., Peters v. Woodbury Cnty., Iowa,* 979 F. Supp. 2d 901, 955 (N.D. Iowa 2013).   One looks to whether the detainee refused to comply with directions; used abusive language towards the officers; acted in an aggressive manner towards the officers; or engaged in "conduct suggesting that the detainee was a threat to the safety of others or to the order, safety, or efficiency of the institution."   *Id.* (citing *Hicks v. Norwood,* 640 F.3d 839, 842 (8th Cir. 2011)).   In this case, the Court has been provided with contradictory evidence regarding what actually occurred on April 21, 2019, when Hurst was removed from his cell and placed in a restraint chair.   At the summary judgment stage, the Court is not free to adopt one parties' version of the events over another's.   Instead, the Court must "view the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party."   *Wells Fargo Fin. Leasing, Inc. v. LMT Fette, Inc.,* 382 F.3d 852, 855-56 (8th Cir. 2004).   The Court concludes there are genuine issues of material fact as to whether Deputy Sikes used excessive force against Hurst, and thus, Deputy Sikes is not entitled to summary judgment.

Similarly, Deputy Sikes is not entitled to qualified immunity.   *Pace v. City of Des Moines,* 201 F.3d 1050, 1056 (8th Cir. 2000)(if a "genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that ground).   The Court believes there are genuine issues of material fact as to whether excessive force was used and as to whether Hurst was being noncompliant.   In other words, the Court has

found that the record, when viewed in the light most favorable to Hurst, would allow a reasonable trier of fact to conclude that Deputy Sikes violated Hurst's clearly established rights.   The law in 2019 was clearly established that force may be used against a noncompliant inmate only if the inmate poses a threat to himself, other persons, or to prison security.

**(2)   Failure to Intervene Claim**

Hurst's claim against Corporal Franks is that Franks merely stood by and watched while excessive force was used against Hurst.   *Nance v. Sammis,* 586 F.3d 604, 612 (8th Cir. 2009) (officer may be held liable for failing to intervene to prevent the unconstitutional use of force by another officer). This is properly considered as a related failure to intervene claim.   *Hicks,* 640 F.3d at 843.   A duty to intervene arises when "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."   *Robinson v. Payton,* 781 F.3d 824, 829 (8th Cir. 2015)(cleaned up); *see also Buckner v. Hollins,* 983 F.2d 119, 122 (8th Cir. 1993)(duty to intervene when excessive force is being used against an inmate and the inmate claims injury due to the officer's failure to act).   In this regard, the "duration of the episode [must be] sufficient to permit an inference of tacit collaboration."   *Krout,* 583 F.3d at 565.

The Court does not believe the facts establish either prong of a failure to intervene claim against Franks.   When Deputy Sikes and Corporal Franks entered the cell, there is no evidence suggesting that Corporal Franks knew, or should have known, excessive force was about to be used against Hurst.   The summary judgment record is simply devoid of any factual allegations regarding what Corporal Franks observed or heard that would have made him aware that Deputy

39

Sikes was going to use excessive force against Hurst while he was being assisted up from the floor. Corporal Franks was on Hurst's opposite side, engaged in assisting Hurst to his feet.

The same is true with respect to Deputy Sikes' actions in securing Hurst's shoulder strap to the restraint chair. Nothing in the summary judgment record suggests any basis on which Corporal Franks should have been aware that Deputy Sikes would use an unconstitutional amount of force in securing Hurst in the chair. *Hollingsworth v. City of St. Ann.,* 800 F.3d 985, 991 (8th Cir. 2015)(must show officer observed or had reason to know a constitutional violation was occurring).

The second prong of a failure to intervene claims requires the officer to have the opportunity and means to prevent the harm from occurring. In both instances at issue in this case, the use of force was of a short duration. Both instances occurred quickly and were not a continuation of the other. There is no evidence that Corporal Franks had an opportunity to prevent the alleged use of excessive force. Corporal Franks is therefore entitled to summary judgment in his favor.

To the extent Hurst's claim against Sergeant Hobelmann may be construed as a failure to intervene claim, the claim fails. As pointed out above, there are two separate instances of short duration when excessive force was allegedly used by Deputy Sikes. There is no evidence suggesting Sergeant Hobelmann knew, or should have known, that excessive force was about to be used. Similarly, Sergeant Hobelmann lacked the opportunity to prevent the harm alleged to have occurred. Sergeant Hobelmann is entitled to summary judgment in his favor on this claim. Having found no constitutional violation, Corporal Franks and Sergeant Hobelmann are entitled to qualified immunity on this claim. *Krout,* 583 F.3d at 564.

### (3)   Medical Care Claim

To prevail on this claim, Hurst must show that Deputy Sikes or Corporal Franks knew about and disregarded his serious medical need.   The Court agrees with Defendants that there was no injury that was so obvious that even a layperson would easily recognize the necessity of a doctor's attention.   Despite Hurst's protests to the contrary, there was no evidence, other his assertions, that he was bleeding from the head or ears when he was brought to the BCDC.   No blood or injury was seen by Detective Yager, Officer Pahmiyer, Corporal Franks, Deputy Sikes, or Nurse Malapha.[12]   Hurst admits his behavior could have appeared to have been the result of intoxication on drugs or alcohol.

Further, as noted above, "[t]he level of culpability required to demonstrate deliberate indifference on the part of [detention center] officials is equal to criminal recklessness."   *Holden v. Hirner,* 663 F.3d 336, 343 (8th Cir. 2011).   While Hurst does not believe Nurse Malapha properly evaluated him, Hurst agrees she came to his cell and told the officers that nothing was wrong with him.   Detention "officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis and the decision" whether treatment is needed.[13]   *Id.* It follows that neither Deputy Sikes nor Corporal Franks exhibited deliberate indifference to Hurst's serious medical needs.   Having found these facts do not make out a constitutional

---

[12] While Sergeant Hobelmann is a named Defendant, the Court has no affidavit or incident report from him.   He is only identified as one of the two officers who appear in the video as the restraint chair arrives.   Moreover, Hurst's deposition does not discuss Sergeant Hobelmann.   In his supplement adding Sergeant Hobelmann as a Defendant, Hurst does not mention any denial of medical care claim.   (ECF Nos. 25 & 97).

[13] This does not mean that non-medical detention officials are shielded from liability.   "[A]lthough prison officials are not doctors, when personally confronted with the serious medical needs of a prisoner, prison officials cannot be deliberately indifferent to those needs by inaction."   *Frazier v. Kelley,* 460 F. Supp. 3d 799, 840-41 (E.D. Ark. 2020)(citing *Schaub v. VonWald,* 638 F.3d 905, 918 n. 6 (8th Cir. 2011)).

violation, Defendants are entitled to qualified immunity.   *See, e.g., Krout,* 583 F.3d at 564.

### (4)   Official Capacity Claim

An official capacity claim is considered a claim against the employing governmental entity – in this case, Benton County.   *White v. Jackson*, 865 F.3d 1064, 1075 (8th Cir. 2017).   A governmental entity may not be held liable for an injury inflicted solely by its employees or agents on a *respondeat superior* theory of liability.   *Monell v. New York Dep't. of Soc. Servs.,* 436 U.S. 658, 694 (1978).   "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise."   *Corwin v. City of Independence, Mo.,* 829 F.3d 695, 699 (8th Cir. 2016)(citations omitted).

At his deposition, Hurst was asked what policy, practice, or custom, he believed caused the denial of his medical care, and he testified that Defendants violated BCDC policy by not giving him a "complete medical lookover."   (ECF No. 75-6 at 82-83).   With respect to the use of the restraint chair and his resulting neck injury, Hurst contends the restraint chair policy was broken because he was not a danger to himself or others.   *Id.* at 79.   Second, it was his belief that the restraint chair policy was broken because he had a medical condition.   *Id.* at 79-80.   According to Hurst, the policy provided that if the inmate had "any medical thing wrong [with] them—you can't put them in the restraint chair."   *Id.* at 80.   Hurst says had he immediately been examined by the nurse, he would never have been placed in the restraint chair.   *Id.* at 83.   Finally, Hurst believed it was "bad policy" for the restraint chair to be used to move inmates around the facility. *Id.* at 81.

Hurst may establish municipal liability by demonstrating that a policy of Benton County

was the moving force behind the alleged constitutional violations.   In this context, policy means an "official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."   *Corwin v. City of Independence, Mo.,* 829 F.3d 695, 700 (8th Cir. 2016).   Hurst has pointed to no policy the application of which caused the constitutional violations.   To the contrary, Hurst maintains the BCDC policies were broken by the Defendants, and this is the exact opposite of establishing the existence of an unconstitutional policy.   *See e.g., Johnson v. Blaukat,* 453 F.3d 1108, 1114 (8th Cir. 2006) (finding no § 1983 liability where county's policies, which were facially constitutional, were not followed by its employees).

Hurst may also establish municipal liability by showing an unofficial custom was the moving force behind the constitutional violations.   To prevail, Hurst must show there was an unofficial custom that violated his constitutional rights.   *Monell,* 436 U.S. at 694.

> [A] plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Corwin*, 829 F.3d at 700 (cleaned up).   Here, Hurst fails on each of the three prongs necessary to establish liability through an unofficial custom.   Hurst points to no continuing, widespread, persistent pattern of unconstitutional conduct, noting (to his detriment) that this instance is the first time in twenty-three years of frequent incarcerations, including multiple incarcerations in the BCDC, that he has been placed in the restraint chair.   Hurst does not refer the Court to other instances where inmates were placed in the restraint chair and has not shown "a sufficient number

43

of unconstitutional acts to support an inference" of any deliberate indifference or tacit authorization by policymaking officials to employee misconduct.  *Mick v. Raines,* 883 F.3d 1075, 1080 (8th Cir. 2018)(affidavits of three detainees insufficient to establish a genuine issue of material fact as to "whether there was a widespread custom or practice of unconstitutional misconduct, known to and unaddressed by policymaking officials"); *see also Parrish v. Luckie,* 963 F.2d 201, 204-05 (8th Cir. 1992)(reviewing the "detailed and compelling" evidence the plaintiff presented that defendant police department avoided, ignored, and covered up complaints of physical and sexual misconduct by officers); *Harris v. City of Pagedale,* 821 F.2d 499, 501-06 (8th Cir. 1987)(municipal custom proven through the presentation of detailed evidence regarding he particular officer's previous misconduct, and the city's failure to investigate or punish that conduct).  Hurst has not illustrated that an unofficial custom was the moving force behind these alleged constitutional violations.

A final method of establishing municipal liability is by showing a deliberately indifferent failure to train or supervise.  To show deliberate indifference, Hurst must prove the Benton County "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights."  *Jennings v. Wentzville R-IV Sch. Dist.,* 397 F.3d 1118, 1122 (8th Cir. 2005).  Hurst has presented no argument that there was a deliberately indifferent failure to train or supervise the offending actors, and thus, Hurst has failed to show the existence of a genuine issue of material fact as to municipality liability under all three avenues.

**(5)  Negligence Claim**

Hurst maintains Sergeant Hobelmann was negligent in performing his duties as set forth in the restraint chair policy.  As Sergeant Hobelmann correctly argues, negligence does not state a

claim of constitutional dimension.   *Daniels v. Williams,* 474 U.S. 327, 328 (1986) (the Constitution is not implicated by a negligent act of an official causing unintended loss of, or injury to, life, liberty, or property).   Moreover, internal policies or procedures do not given rise to a constitutional right and an official's simple failure to follow such a policy does not give rise to a § 1983 claim.   *Phillips v. Norris,* 320 F.3d 844, 847 (8th Cir. 2003)(no liberty interest created by prison policy); *Gardner v. Howard,* 109 F.3d 427, 430 (8th Cir. 1997)("no § 1983 liability for violating prison policy").   Sergeant Hobelmann is entitled to summary judgment on Hurst's negligence claim.

### IV.   Nurse Malapha's Motion for Summary Judgment

#### A.   Summary of the Facts

Hurst's claim against Nurse Malapha is based on her failure to assess or treat his head injury during his incarceration at the BCDC on April 20-21, 2019.   (ECF No. 79-1 at 66).   At all times relevant to this case, Nurse Nadia Malapha was employed by Turn Key Health Clinics, LLC as a nurse at the BCDC.   (ECF No. 79-3 at 2).   Nurse Malapha indicates she is familiar with Hurst and has provided medical services to him during his incarcerations at the BCDC.   *Id.*

Hurst contends that Sergeant Hobelmann brought Nurse Malapha to the cell (ECF No. 91 at 7), but testified that Hurse Malapha did not touch his head, look in his ears, or give him any type of eye test.   (ECF No. 79-1 at 66).   She simply walked up, looked at him, said "[t]here's nothing wrong with him, and walked off.   *Id.* at 33-34 & 66.   Hurst maintains he was "bleeding out of [his] head in two spots on a bump that's two inches high."   *Id.* at 66.   Hurst then maintains that an inmate with an injury is not supposed to be placed in a restraint chair until they are "checked out first."   (ECF No. 79-1 at 66-67).   Hurst understands Nurse Malapha did not make the decision

to put him in a restraint chair but argues that had she identified and reported his head injury, he would not have been placed in the chair.  *Id.* at 66; *see also* (ECF No. 91 at 3)("if Nurse Nadia would [have] looked at me[,] HER JOB[,] I would [have] not been place[d] in [the] restraint chair incorrectly as I would have been sent to [the] hospital").[14]  Hurst did not recall receiving his medication on April 20, 2019, but believes he received two medications, hydrochlorothiazide and lisinopril, the following day prior to his discharge.  (ECF No. 79-1 at 72-73).  Hurst admits that when he was seen at the emergency room on April 21, 2019, his alleged injury was not bandaged or stitched; he learned that he had some head swelling.  (ECF No. 79-1 at 68).  He was not diagnosed as having a concussion.  *Id.* at 69.  He was only given over-the-counter medication for a headache.  *Id.* at 71.  In connection with his alleged neck injury, Hurst has not been diagnosed with whiplash or other injury.  *Id.*

Nurse Malapha states that jail medical staff defer to Turn Key regarding any medical conditions.  (ECF No. 79-3 at 2).  Nurse Malapha indicates she never observed a jail employee, including Corporal Franks or Deputy Sikes, act deliberately indifferent to Hurst's medical needs. *Id.* at 2-3.  She maintains neither she, nor any other Turn Key employee, "every denied or delayed Mr. Hurst access to medical care."  *Id.* at 2.  According to Nurse Malapha, "[i]t is the normal custom, pattern and practice of Corporal Franks, Sergeant Hobelmann, and Deputy Sikes to ask Turn Key nurses to examine inmates who appear to be suffering from an acute medical condition, including a head injury, when they are in the Jail."  (ECF No. 79-3 at 3).  Nurse Malapha asserts

---

[14] In his unsworn response to Nurse Malapha's statement of undisputed facts, Hurst maintains that Nurse Malapha was present when he was placed in the restraint chair.  (ECF No. 91 at 10).  These statements are not made by reference to material in the record, in the form of an affidavit, or as a sworn declaration under 28 U.S.C. § 1746. Therefore, Hurst's response to Nurse Malapha's statement of facts does not satisfy the requirements of Rule 56(c)(1) of the Federal Rules of Civil Procedure and does not constitute admissible evidence.  *See e.g., Meehan v. United Consumers Club Franchising Corp.,* 312 F.3d 909, 914 (8th Cir. 2002)("All civil litigants are required to follow applicable procedural rules").

she was not asked to examine Hurst "as a patient on April 20, 2019."   However, "[c]onsistent with Turn Key policy and practice, I did enter the physician orders to continue the medications that Mr. Hurst has reported to the booking officers upon entry into the Jail on April 20, 2019.   Beyond entering his reported medications into the electronic records system, I was not involved in Mr. Hurst's medical care on April 20, 2019, or April 21, 2019."   *Id.*

Because Hurst was never placed in a housing unit, Nurse Malapha indicates he did not "undergo an Intake Nursing Assessment by any Turn Key personnel before he was released from the Jail on April 21, 2019."   (ECF No. 79-3 at 3).   Nurse Malapha indicates she never observed Hurst to be bleeding from his head or ears.   *Id.*   Nurse Malapha states she has never denied or delayed Hurst's access to blood pressure medication.   *Id.*   Records indicate that on April 20, 2019, that orders were placed for Hurst to begin receiving hydrochlorothiazide (HCTZ) and lisinopril that day.   (ECF No. 79-4 at 16-18).   According to these records, Hurst was offered both medications three times and refused or was unavailable on one occasion the medication was offered.   *Id.* at 17-18.   Thus, during the two-day period he received his medication on two occasions.   *Id.*   The orders were cancelled on April 22, 2019, because Hurst had been released. *Id.*

### B.   Application of the Law

Nurse Malapha moves for summary judgment on the following grounds.   First, she argues Hurst was not suffering from an objectively serious medical condition, simultaneously arguing she was unaware Hurst was claiming he had a head injury.   Second, she maintains Hurst can present no evidence that she was deliberately indifferent to his serious medical needs, and in this regard, contends Hurst never exhibited any external signs or symptoms of a head injury.   She maintains

the only involvement she had with Hurst's medical care was placing orders for his prescription medication.   Nurse Malapha next argues Hurst can provide no evidence of actual harm or damages based on his allegations against her and finally, contends Hurst cannot establish a basis for official capacity liability.

### (1)   Medical Care Claim

To succeed on denial of adequate medical care claim, Hurst must demonstrate (1) that he had an objectively serious medical need and (2) that Nurse Malapha actually knew of, but deliberately disregarded, that need.   *See Ivey v. Audrain Cnty., Mo.,* 968 F.3d 845, 848 (8th Cir. 2020) (cleaned up).   Nurse Malapha maintains Hurst cannot demonstrate the existence of a material issue of face with respect to either the objective or the subjective prongs of this analysis. The Court agrees.

With respect to the objective prong of the analysis, Hurst does not deny that he appeared to be intoxicated on either alcohol or drugs.   Rather, he maintains that his erratic and boisterous behavior was caused by his failure to take his blood pressure medication in a timely manner. Although he says he was bleeding from both his ears and his head, Hurst admitted in this deposition that he did not find blood in his ears until several days later when he cleaned them.   Hurst also acknowledges that the only way Nurse Malapha could have seen the blood or the bump on his head was to part his hair and examine his head, implicitly admitting there were no obvious and outward signs of any type of head injury.

Although Nurse Malapha denies being requested to examine or observe Hurst on April 20, 2019, she argues that even assuming as true Hurst's allegation that she "looked in on him," Hurst still exhibited no signs of an objectively serious medical need.   Nurse Malapha points out that

even when Hurst visited the emergency room the following day, the only clinical observation was swelling on the left parietal occipital.   The Court agrees.   During the hospital examination, no lacerations were found and there is no indication of blood in the area described as swollen.   For that matter, the only note concerning the presence of blood was a small amount of dried blood in Hurst's left ear.   Hurst received no treatment and only over the counter medication prior to his release.

At most, Nurse Malapha's inactions resulted in a delay of medical care by only a single day.   When a delay in treatment is alleged, the Court measures the objective severity of the deprivation "by reference to the *effect* of the delay in treatment."  *Jackson v. Riebold,* 815 F.3d 1114, 1119 (8th Cir. 2016)(cleaned up).   To support a delay in treatment claim, Hurst must "present verifying medical evidence" showing that the delay in treatment had detrimental effects, *i.e.,* adversely affected his prognosis.[15]   *Holden v. Hirner,* 663 F.3d 336, 342 (8th Cir. 2011).   No such evidence exists in this case.

The Court does not believe there is any genuine issue of material fact as to whether Nurse Malapha exhibited deliberate indifference to Hurst's serious medical needs.   "A plaintiff can show deliberate indifference in the level of care provided in different ways, including showing grossly incompetent care, showing a defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant intentionally delayed or denied access to medical care."  *Allard v. Baldwin,* 779 F.3d 768, 772 (8th Cir. 2015).   Taking as true Hurst's allegation that Nurse Malapha merely looked at him and concluded that there was nothing wrong with him, these facts

---

[15] If the deprivation is obvious to a layperson, submission of verifying medical evidence is not necessary.   *Schaub v. Von Wald,* 638 F.3d 905, 919 (8th Cir. 2011).   Here, Hurst indicates his injury did not become obvious or visible to others until he shaved his head.   (ECF No. 75-6 at 25).

do not establish deliberate indifference.   In *Foulks v. Cole Cnty.,* 991 F.2d 454, 457 (8th Cir. 1993), the Court held that "if a reasonable official would have known that observation and treatment was necessary, the refusal to provide access [to] the treatment would constitute deliberate indifference."

Hurst arrived at the jail on a charge of public intoxication, admitting that he had not taken his blood pressure medication and acknowledging that when his skipped his medication, he appeared as if taking methamphetamine. Hurst was not exhibiting behavior typically associated with head injuries – he did not pass out, appear to be dizzy, or hold his head in a manner indicating his head was hurting.   Hurst's condition did not appear to be deteriorating and he did not exhibit any symptoms appearing to require urgent care.   There is simply no evidence in the record suggesting that Nurse Malapha intentionally denied or delayed Hurst's treatment or that she interfered with prescribed medical treatment.   *Meloy v. Bachmeier,* 302 F.3d 845, 849 (8th Cir. 2002).   To the contrary, the evidence shows she verified Hurst's blood pressure medication and entered an order to ensure his medication was distributed.   Differences of opinion, mistakes, or even medical malpractice do not meet the exacting deliberate indifference standard.   *Jones v. Norris,* 310 F.3d 610, 612 (8th Cir. 2002).   Nurse Malapha is entitled to summary judgment on the denial of medical care claim.

### (2)   Official Capacity Claim

Here, Turn Key is under contract to provide medical services to Benton County.   Thus, an official capacity claim against Nurse Malapha is "functionally equivalent" to a claim against her employer, Turn Key.   *Johnson v. Hamilton,* 452 F.3d 967, 973 (8th Cir. 2006).   To support a

claim against a medical contractor such as Turn Key,[16] Hurst "must show that [Turn Key had] a policy, custom, or official action that inflicted an actionable injury."   *Id.*   Hurst points to no such policies, customs, or practices of Turn Key. Furthermore, as noted above, "[w]ithout a constitutional violation by the individual officers, there can be no § 1983 or Monell ... liability." *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007).   As Nurse Malapha did not violate Hurst's constitutional rights, Turn Key cannot be held liable under § 1983. *Lombardo v. City of St. Louis,* 956 F.3d 1009, 1015 (8th Cir. 2020).

## V.   CONCLUSION

For these reasons, the undersigned recommends that:

(1)   The Motion for Summary Judgment (ECF No. 69) filed by Officer Pahmiyer be **GRANTED** as to all claims against Office Pahmiyer.

(2)   The Motion for Summary Judgment (ECF No. 73) filed by Corporal Franks, Sergeant Hobelmann, and Deputy Sikes be **GRANTED IN PART AND DENIED IN PART;** the Motion be **GRANTED** with respect to all claims against Corporal Franks and Sergeant Hobelmann, including the official capacity claims, but the Motion be **DENIED** with respect to the individual capacity excessive force claims against Deputy Sikes.

(3)   The Motion for Summary Judgment (ECF No. 79) filed by Nurse Malapha be **GRANTED** as to all claims against her.

**Adoption of this Report and Recommendation would leave for later resolution only the individual capacity excessive force claims against Deputy Sikes, as it is recommended**

---

[16] Benton County does not shield itself from liability by contracting out the provision of medical services.   Benton County still has a "constitutional duty to provide adequate medical care to those in its custody."   *West v. Atkins,* 487 U.S. 42, 56 (1988).

<u>that all other claims and parties be dismissed.</u>

The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 24th day of March 2022.

*Christy Comstock*
_____
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE